**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**1:18-cv-00255-MOC-WCM**

| | |
|---|---|
| **CHERIE FISHER, as personal representative for DALLAS FISHER,** ) ) ) | |
| **Plaintiff**, ) ) | |
| vs. ) ) ) | **ORDER** |
| **UNITED STATES of AMERICA,** ) ) | |
| **Defendant**, ) ) | |

**THIS MATTER** comes before the Court on the Government's Motion to Dismiss for Lack of Subject Matter Jurisdiction and for Summary Judgment. (Doc. No. 58). The Government submitted its brief in support of dismissal and summary judgment on October 30, 2020. (Doc. No. 59). Plaintiff Cherie Fisher submitted a Response to the motion on November 20, 2020. (Doc. No. 62).[1] The Government filed its Reply on December 2, 2020. (Doc. No. 64). Thus, this matter is ripe for disposition.

**I.  BACKGROUND**

**A. Procedural History**

In September of 2016, Dallas Fisher wrecked his motorcycle on the Blue Ridge Parkway ("Parkway"), a scenic roadway under the management of the National Park Service ("NPS"), an agency of the United States. Cherie Fisher maintains this action to recover for Dallas's injuries pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C § 1346(b), §§ 2671-80. She asserts

---

[1] On August 20, 2019, Dallas Fisher passed away unexpectedly for reasons unrelated to the claims in this lawsuit. (Doc. No. 32 at ¶ 1). Ms. Fisher was substituted for Fisher in the nature of a survivorship action. (Doc. Nos. 33, 34).

claims of negligent installation of signage, negligent maintenance of the roadway, negligent failure to warn, and negligence per se. She filed this action on September 7, 2018. (Doc. No. 1). The United States filed a partial motion to dismiss pursuant to Rule 12(b)(1). (Doc. No. 19). The Court denied the motion and held it under consideration "pending further development of the record and summary judgment motions." (Doc. No. 28 at 1-2). Ms. Fisher voluntarily dismissed her individual claims in August 2020. (Doc. No. 45).

### B. The Blue Ridge Parkway and the National Park Service

The Parkway is an "unusual highway." Bowman v. United States, 820 F.2d 1393, 1393 (4th Cir. 1987). It is designed and managed "to allow the public access to scenic recreational and wilderness areas . . .[l]eisure driving and sight-seeing . . . are its intended use." Id. It weaves through western North Carolina and Virginia and showcases the region's natural beauty, ecology, history, and culture. (Doc. No. 20-1, Decl. of Park Superintendent J.D. Lee ("Lee Decl.") at ¶¶ 2- 3). The Parkway is open year-round free of charge, except for periodic closures due to weather-related or other conditions. (Id. at ¶ 4). The maximum speed limit is forty-five miles per hour, with sections that require reduced speed due to the topography of mountain driving and other geological factors. (Id. at ¶ 14).

As a National Park unit, the Parkway is managed consistent with the NPS's Organic Act, in which Congress mandated the NPS to "conserve the scenery and the natural and historic objects and the wild life . . . and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101. To carry out its mission, NPS relies upon the 2006 Management Policies ("Management Policies"), which are at the top of NPS policy

2

framework.[2] (Doc. No. 20-1, Lee Decl. at ¶ 6; Doc. No. 20-3 at 9.2.3; Doc. No. 59-2, Dep. of R. Clark at 31:19-32:15; 36:1-9). NPS vests decision-making authority in park superintendents through Director's Orders. (See Doc. No. 20-1, Lee Decl. at ¶ 13; Doc. No. 20-7 at 2). Director's Orders and reference manuals are subordinate policy documents. (Doc. No. 20-1, Lee Decl. at ¶ 6; Doc. No. 20-2 at 4-5).

### C. Policy for Signage on the Blue Ridge Parkway

The Management Policies directly address signage in national parks. (Doc. No. 20-1, Lee Decl. at ¶ 7; Doc. No. 20-3 at 9.2.3). The "foundational policies" provide that signs will be limited, planned to "provide a pleasing, uniform appearance," "will be consistent with the standards contained in the Manual on Uniform Traffic Control Devices ("MUTCD")," and "will conform to good traffic engineering practices." (Doc. No. 20-3 at 9.2.3). The MUTCD, which is published by the Federal Highway Administration ("FHWA") under 23 C.F.R. § 655.601 et seq., includes guidance for warning signage. (See Doc. No. 59-3, MUTCD excerpts, at i).

Director's Order 52C "Park Signs" indicates that signs should "[o]ffer clear, concise, and consistent communications to park visitors," refrain from "intruding on natural and historic settings," be "appropriate in appearance, size, and material to a wide range of park environments," and allow for changed needs and circumstances. (See Doc. No. 20-5 at 3). Use of standards is moderated by the nature of the cultural landscapes, historic districts, backcountry, and wilderness areas in national parks "in accordance with established policies and practices." (Id.). The MUTCD is listed as one of many sources of "guidance." (Id. at 6). The foregoing policy documents and standards remain current Park policy. (Doc. No. 59-2, Clark Dep. at 52:5-

---

[2] In agency parlance, the NPS defines the Management Policies a "Level 1" document, at the top of the policy hierarchy. (Doc. No. 20-1, Lee Decl. at ¶ 6). Director's Orders are "Level 2" documents; reference manuals are "Level 3" documents. (Id.).

16).

The MUTCD is a reference manual, the lowest level of NPS policy hierarchy. (Doc. No. 59-2, Clark Dep. at 32:6-15; 61:1-6). NPS policy allows the agency to deviate from MUTCD standards. (Id. at 62:24-65:12). Assistant NPS Sign Program Director Bob Clark confirmed that the MUTCD is a reference manual that provides guidance while "determin[ing] the need" for signage in a particular situation as well as when and how "messages can be altered to fit conditions." (Id. at 61:1–6; 64:6–7; 64:21-65:12). A 2006 Memorandum of Understanding ("2006 MOU") between FHWA and NPS references the NPS UniGuide reference manual and confirms that the UniGuide reference manual "is considered to be in substantial conformance with the [MUTCD]." (Doc. No. 25-1 at 2).

While the MUTCD "describes the application of traffic control devices," it expressly states that it "shall not be a legal requirement for their installation." (Doc. No. 59-3, MUTCD at 4 § 1A.09, 02). The MUTCD contains "standards, guidance, options and support." (Id. at 10, § 1A.13 (defining the headings)). "Standard" headings contain mandatory practices. (Id.). "Guidance" headings are recommended, but not mandatory. (Id.). "Options" carry no requirement or recommendation, and "Support" statements are merely informational. (Id.).

Section 2C.05 of the MUTCD addresses the advance placement of warning signs. (Id. at 108-09, § 2C.05). It contains no standards—only guidance, option, and support. (Id.). Table 2C-4 is also guidance and is "provided as an aid for determining warning sign location." (Id. at § 2C.05 02). Plaintiff's expert, J. Mark Teague, confirmed that there are no standards (or requirements) for placement of warning signs in the MUTCD, and that Table 2C-4 is guidance, not a mandate. (Doc. No. 59-4, Dep. of J. M. Teague at 42:3–6; 71:13–16; 103:13–16).

D. **Milepost 466.6, Signage, and Maintenance on the Parkway**

Dallas Fisher's crash occurred at milepost 466.6—a section of the Parkway located between Waynesville and Cherokee, North Carolina. (Doc. No. 59-5, Dep. of J. Bowers at 16:1-8; Doc. No. 20-1, Lee Decl. at ¶ 15). Milepost 466.6 features a "hairpin" spiral curve and a substantial, tree-lined decline. (Doc. No. 20-1, Lee Decl. at ¶ 15). Not far from the center of the spiral curve, natural subsurface activity has caused a bump in the roadway. (Id.).

At the time of Dallas Fisher's crash in September 2016, the NPS had installed a series of signs to warn drivers of the curve, decline, and bump. (Doc. No. 20-1, Lee Decl. at ¶ 16; Doc. No. 20-8, Doc. No. 20-9, Doc. No. 20-10; Doc. No. 59-5, Bowers Dep. at 26:11–27:7; 29:4–25; 31:11-32:2). The first sign a driver encounters is approximately 975 feet in advance of the bump and reads "SLOW DANGEROUS CURVE" with a 25-mph advisory speed. (Doc. No. 20-1, Lee Decl. at ¶ 16(a); Doc. No. 20-8; Doc. No. 59-6, Dep. of D. McCandless at 54:9–17). The next sign is located approximately 564 feet in advance of the bump and states, "SPIRAL CURVE AND BUMP." (Doc. No. 20-1, Lee Decl. at ¶ 16(b); Doc. No. 20-9). The next sign is a left curve ahead sign, located 387 feet in advance of the bump. (Doc. No. 59-6, McCandless Dep.; Doc No. 59-1, Report at 4, 7). The next sign is approximately 240 feet in advance of the bump and is the first of five chevron alignment signs that guide drivers around the curve. (Doc. No. 59-6, McCandless Dep.; Doc. No. 59-1, Report at 4, 8). After the fourth chevron sign, there is a yellow, diamond "BUMP" sign approximately 25 feet before the bump. (Doc. No. 25-4 at 7). The last sign is the fifth chevron and is located at approximately the same location as the bump. (Id.).

The signs were installed at different times over three decades to assist motorists to navigate the curve and bump. (Doc. No. 59-5, Bowers Dep. at 29:4–25; 31:11–32:2; 54:15–55:21). Several considerations guide the placement and number of signs on the Parkway,

5
Case 1:18-cv-00255-MOC-WCM   Document 65   Filed 12/17/20   Page 5 of 19

including visitor safety and enjoyment, conservation of resources (including budgeting and staffing), and promoting and maintaining the natural beauty of the environs around the roadway. (Doc. No. 20-1, Lee Decl. at ¶ 19).

Roadway conditions on the Parkway are managed by engineering and maintenance staff with direct support from the NPS's Denver Service Center—the NPS's design and engineering professional services division. (Doc. No. 59-7, Dep. of J. Grant at 14:3–24; 18:1–3; 21:21–24; 22:11–23:9; 33:20–34:11). These NPS staff also work with the FHWA for periodic assessment and engineering support. (Id. at 23:10–17; Doc. No. 59-8, Dep. of J. Setzer at 23:11–13). The Parkway's maintenance division is responsible for ordinary upkeep of the Parkway's roadway, buildings, utilities, and trails. (Doc. No. 59-5, Bowers Dep. at 13:25–14:6). This upkeep includes routine road maintenance, such as filling potholes. For road maintenance of more significant scope, the NPS hires contractors based on available funding. (Id. at 14:1–11, 47:17–22; Doc. No. 59-7, Grant Dep. at 35:1–6, 36:21–37:12, 43:10–44:12). The NPS and FHWA regularly inspect the roadway approximately every three to five years and compile data about (and rate) road conditions in Road Inventory Program Reports ("RIP reports"). (Doc. No. 59-7, Grant Dep. at 35:11–36:4). NPS uses the RIP reports to prioritize projects with available funding. (Id. at 22:22–23:17, 35:11–25). Before Mr. Fisher's motorcycle crash, RIP reports were prepared in 2009 (Cycle 4) and in 2013 (Cycle 5). (Doc. No. 59-9a and b (excerpts from RIP reports)).

The section of the Parkway at milepost 466.6 has a recurring subsurface condition based on natural fluctuations in groundwater levels that cause a bump or dip to reappear from time to time. (Doc. No. 59-10, Dep. of N. Labrie, at 41:18–42:17; Doc. No. 59-8, Dep. of J. Setzer at 19:12–16). This condition occurs in multiple places on the Parkway and in roadways in all networks of western North Carolina. (Doc. No. 59-10, Labrie Dep. at 42:7–17; Doc. No. 59-8,

Setzer Dep. at 24:6–8). Correcting the recurring condition is a substantial engineering task that is beyond the scope of routine maintenance. (Doc. No. 59-5, Bowers Dep. 39:2–15; Doc. No. 59-8, Setzer Dep. Ex. 1 at 10).

Nevertheless, the NPS performed maintenance and contracted for work at the area around milepost 466.6 multiple times before Fisher's accident. (Doc. No. 59-5, Bowers Dep. at 33:17–34:11; Doc. No. 59-11, Decl. of L. Hultquist at ¶¶ 8–10). Specifically, the agency contracted a private company to perform paving work in and around milepost 466.6 in 2003 and 2004. (Doc. No. 59-5, Bowers Dep. at 33:17–34:11). Subsequently, in 2008 and 2009, additional milling and overlay work was done at the bump pursuant to a FHWA project. (Doc. No. 59-11, Hultquist Decl. at ¶¶ 8–10).[3]

Plaintiff has not designated an expert to offer opinions or testimony on maintenance issues or the standard of care for roadway maintenance. Plaintiff's expert, Teague, testified that he did not investigate or offer opinions on maintenance. (Doc. No. 59-4, Teague Dep. at 36:16–17). The United States designated Joel B. Setzer, P.E., an engineer with over twenty-four years of experience managing maintenance on roadways in western North Carolina, as an expert on road maintenance. (Doc. No. 59-8, Setzer Dep. at Ex. 1 at 10).[4] Setzer confirmed that the NPS's actions of performing periodic pavement repairs and erecting warning signs were consistent with

---

[3] The 30(b)(6) witness was unaware of maintenance that occurred at milepost 466.6 between 2006 and 2014 because he did not work at the Parkway then but acknowledged that maintenance could have occurred during this time. (Doc. No. 59-5, Bowers Dep. at 12:14–24, 34:21–23, 43:19–45:3). In September 2020, in comparing RIP reports, maintenance expert Joel Setzer observed that a road repair occurred between 2009 and 2013. (Doc. No. 59-8, Setzer Dep. Ex. 1 at 5). Thereafter, the NPS identified Larry Hultquist, a retired NPS project manager, who confirmed that additional milling and overlay work was completed at milepost 466.6 in 2008 or 2009. (Doc. No. 59-11, Hultquist Decl. at ¶¶ 5–10).
[4] Setzer testified that the cited report contains his expert opinions and conclusions. (Doc. No. 59-8, Setzer Dep. at 5:24–6:7, 8:18–23).

the standard of care. (Doc. No. 59-8, Setzer Dep. at 13).

### E. Accident History at Milepost 466.6 and Fisher's Motorcycle Accident

Thousands of motorcyclists traverse the bump at milepost 466.6 every year. (Doc. No. 59-10, Labrie Dep. at 45:7–47:25, 54:20–55:9; Doc. No. 59-5, Bowers Dep. at 38:6–9; 57:19–21). Other areas of the Parkway have higher incidences of accidents and have been the subject of traffic studies and audits. (Doc. No. 59-10, Labrie Dep. at 45:7–47:25, 54:20–55:9). From 2012 to the date of Fisher's crash in September of 2016, there were five accidents at milepost 466.6. (Doc. No. 59-12, Incident and Crash reports). Two clearly involved the bump. (Id. at 12a, 12e). The first occurred on April 12, 2015, and contributing factors were speed and the driver's failure to give "full time and attention." (Doc. No. 59-12a at USA 000199). The second accident occurred on September 3, 2016, five days before Fisher's accident, and contributing factors included the driver's failure to maintain control and over-correcting/over-steering. (Doc. No. 59-12e at USA 000179, USA 000222). Accidents appear to have occurred in May and June of 2016, but there is no mention of the bump in the incident or crash reports. (Doc. No. 59-12b, d).

On the afternoon of September 8, 2016, Fisher and his friends were riding motorcycles on the Parkway. (Doc. No. 1 at ¶ 7). They were on their way to purchase pizza. (Doc. No. 62-14, Cherie Fisher Dep. 56:10–13). While going around the curve at milepost 466.6, Plaintiff wrecked his motorcycle. (Doc. No. 1 at ¶ 7). In a written statement, Plaintiff stated that "[r]ight before I wrecked, [I] saw bump in road sign." (Doc. No. 1-2 at 9). Officer Cody Skyler Marsh prepared an incident report in which he described a "significant rise or 'bump' in the roadway" near the site of the accident as well as other traffic signs (including the "BUMP" sign) in the vicinity. (Doc. No. 1-2 at 4). Marsh's report indicates "I didn't see that coming" when he himself drove over the bump. (Id.). He suggested that a "contributing factor" besides the imperfect road surface

was the location of the bump sign and that it blended in with the other signs of similar color. (Id.).

Mr. Fisher suffered serious injuries and was admitted to multiple hospitals. (Doc. No. 1 at ¶¶ 8-10). Even after multiple surgeries and therapy, Mr. Fisher's grip strength in his right hand never returned, and his dominant right hand was permanently impaired. (Id. at ¶ 11). Medical bills exceed $500,000 and economic damages for loss of household services are approximately $116,731. (Id. at 12).

## II.     STANDARDS OF REVIEW

### A. Subject Matter Jurisdiction

Federal district courts are courts of limited jurisdiction. United States ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 347 (4th Cir. 2009). "They possess only that power authorized by Constitution and statute." Randall v. United States, 95 F.3d 339, 344 (4th Cir. 1996). The existence of federal subject matter jurisdiction is a threshold issue, which the court must address before addressing the merits of the claim. See Jones v. Am. Postal Workers Union, 192 F.3d 417, 422 (4th Cir. 1999). The plaintiff has the burden to establish federal subject matter jurisdiction. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982).

A challenge to a court's subject matter jurisdiction under FED. R. CIV. P. 12(b)(1) may be either a facial or factual attack. See Beck v. McDonald, 848 F.3d 262, 270 (4th Cir. 2017). A factual attack challenges the truthfulness of the allegations in the complaint upon which subject matter jurisdiction is based. (Id.). The court is to regard plaintiffs' allegations as "mere evidence on the issue," and may consider evidence outside the pleadings. Richmond, Fredericksburg, & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991); FED. R. CIV. P. 12(d).

The Government seeks dismissal of Plaintiff's claims for negligent signage and failure to

9
Case 1:18-cv-00255-MOC-WCM   Document 65   Filed 12/17/20   Page 9 of 19

warn for lack of subject matter jurisdiction based on the "discretionary function exception" ("DFE") of the Federal Tort Claims Act ("FTCA"). If the DFE applies, then a court must dismiss pursuant to Rule 12(b)(1). See Williams v. United States, 50 F.3d 299, 304–05 (4th Cir. 1995) (when the DFE applies, the district should dismiss for want of jurisdiction rather than grant summary judgment).

### B. The FTCA's Discretionary Function Exception

The FTCA is a limited waiver of the federal government's sovereign immunity that permits the government to be sued in tort. Baum v. United States, 986 F.2d 716, 718 (4th Cir. 1993). Such waivers are strictly construed, see, e.g., Robb v. United States, 80 F.3d 884, 887 (4th Cir. 1996), and if there is no waiver, the district court lacks subject matter jurisdiction. See Williams, 50 F.3d at 304.

The FTCA confers exclusive jurisdiction upon the federal district courts over civil actions allegedly caused by the negligent or wrongful act or omission of a government employee acting within the scope of his or her employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b); 28 U.S.C § 2679. This grant of subject matter jurisdiction is, however, made "[s]ubject to the provisions of chapter 171 of this title . . ." 28 U.S.C. § 1346(b) and the exceptions to the FTCA. Among those exceptions is the DFE.

The DFE retains the sovereign immunity of the United States for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to

protect certain governmental activities from exposure to suit by private individuals." Baum, 986 F.2d at 719 (quoting United States v. Varig Airlines, 467 U.S. 797, 808 (1984)). The DFE demonstrates congressional intent to "prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy . . ." Varig, 467 U.S. at 814 (internal quotations omitted).

In determining whether to apply DFE, courts apply a two-step process. United States v. Gaubert, 499 U.S. 315, 328 (1991). First, a court considers whether the challenged conduct is discretionary in nature, i.e., if the acts involve "an element of judgment or choice." Baum, 986 F.2d at 720. If there is a statute, regulation, or policy that "proscrib[es] a specific course of action," the DFE cannot apply because the conduct "involves no legitimate element of judgment or choice and the function in question cannot be said to be discretionary." (Id.). Permissive language points to the lack of a mandatory requirement and supports application of the DFE. See Seaside Farm, Inc. v. United States, 842 F.3d 853, 859 (4th Cir. 2016) (language describing what an agency "may" or "should" do indicates more guidance than mandate). "[T]he existence of some mandatory language does not eliminate discretion when the broader goals sought to be achieved necessarily involve an element of discretion. Holbrook v. United States, 673 F.3d 341, 348 (4th Cir. 2012) (citing Miller v. United States, 163 F.3d 591, 595 (9th Cir. 1998)).

Second, if no mandatory statute, regulation, or policy applies to remove the challenged conduct from the choice and judgment of the government, then the court moves to the second tier of the analysis and asks whether "the choice or judgment involved is one 'based on considerations of public policy.'" Baum, 986 F.2d at 720 (citation omitted). Under this prong, a court considers whether the challenged action is of the type Congress meant to protect under the DFE, i.e., whether it involves a decision grounded in "social, economic, and political policy."

11
Case 1:18-cv-00255-MOC-WCM   Document 65   Filed 12/17/20   Page 11 of 19

Holbrook, 673 F.3d at 350 (citations omitted). This inquiry "is not confined to the policy or planning level" and extends "to the actions of Government agents" taken "in the course of day-to-day activities." Gaubert, 499 U.S. at 323, 334. The decision giving rise to tort liability need not be grounded in policy considerations but must be susceptible to a policy analysis. Baum, 986 F.2d at 721 (quoting Gaubert, 499 U.S. at 325). It is also irrelevant whether the actual conduct challenged in a particular case amounted to negligence "because § 2680(a) offers immunity 'whether or not the discretion involved be abused.'" Parsons v. United States, 811 F. Supp. 1411, 1416 (E.D. Cal. 1992); 28 U.S.C. § 2680(a).

Because the Court holds that the DFE applies to this case, the Court dismisses the case for lack of subject matter jurisdiction and does not address the argument for summary judgment under North Carolina's Recreational Use Statute.

### III. DISCUSSION

#### A. DFE Step 1: Is the Challenged Conduct Discretionary?

The first step of determining whether the DFE applies requires a court to determine if the challenged federal conduct is discretionary. This Court holds that the NPS and its employees exercise judgment concerning the installation of traffic and warning signs on the Parkway. This conclusion is merited for two primary reasons: (1) NPS sign policy provides for discretion in placing and installing warning signs and (2) the MUTCD provides the NPS discretion.

The Fourth Circuit has observed that "courts recognize that [decisions regarding the posting of warning signs] falls within the purview of the [DFE]." Williams, 50 F.3d at 310 (citing Kiehn v. United States, 984 F.2d 1100, 1103 (10th Cir. 1993)) (stating in a failure to warn claim that "[t]he decision whether or not to post warning signs . . . is clearly discretionary as it 'involves an element of judgment or choice'"); Bowman, 820 F.2d at 1395 (decisions to install

"guardrails and signs" along the Parkway protected by DFE).

In line with these authorities, the placement of signs or other warnings along the Parkway to warn of road and other conditions is not governed by a mandatory or specific regulation. (Doc. No. 20-1, Lee Decl. at ¶¶ 6–13). In the absence of a mandatory or specific regulation regarding signs or warnings, NPS policies provide a framework for addressing the need for signage and/or other warnings about the particular natural, manmade, or other physical or geological conditions at any given point along the Parkway. (Id.; Doc. No. 59-2, Clark Dep. at 35:5–36:9; 49:19–50:4; 52:5–17). The 2006 NPS Management Policies provide that park road signs "will be consistent" with the MUTCD—but also kept to the minimum necessary to meet needs "and to avoid confusion and visual intrusion," a process that fundamentally involves discretion. (See Doc. No. 20-3 at 9.2.3). They also ask managers to do these things in a way that "will conform to good traffic engineering practices." (See id.). This language, which asks for "consistency" in application and references (but does not define) "good traffic engineering practices" is inherently discretionary. Cf. Northlight Harbor, LLC v. United States, 561 F. Supp. 2d 517, 523 (D.N.J. 2008) (applying DFE to dismiss claims of negligent dredging, finding that Army Corps of Engineers representative's testimony that activities were based on "accepted sound engineering principles" preserved agency discretion).

Plaintiff alleges adherence to the MUTCD is mandatory, especially once a decision to install a sign has been made. (See Doc. No. 1 at ¶¶ 16–18; Doc. No. 72 at 7–9). However, the NPS policies do not provide a mandatory directive with respect to the MUTCD. (See Doc. No. 20-3 at 9.2.3). Director's Order 52C dictates that signs should "[a]llow changes as park communication needs and other circumstances change." (Doc. No. 20-1, Lee Decl. at ¶ 10; Doc. No. 20-5 at 3). Director's Order 52C references the MUTCD as "guidance" on road signage,

further underscoring that sign and warning determinations are discretionary acts. (See Doc. No. 20-5 at 5; See, e.g., Aragon v. United States, 146 F.3d 819, 824–25 (10th Cir. 1998) (Air Force manual did not set forth mandatory directives because it was intended for guidance).

Moreover, nothing in the various policy documents— the 2006 Management Policies, the NPS Director's Order 52C, and NPS Park Roads Standards—recognizes the distinction (decision to install signs versus manner of installation) that Plaintiff relies on to avoid the DFE. If Plaintiff were correct, then park managers would lose their discretion to install signs immediately after they determined a sign was needed. No such distinction exists.

The Third Circuit faced just such a question in considering a challenge to the adequacy of NPS warning signs, not only the decision to install them. Abunabba v. United States, 676 F.3d 329, 334–37 (3rd Cir 2012). In that case, the court found that the NPS's decision not to add language to existing warning signs was protected by the DFE. Id. at 335-36. In finding that the decision to warn and content of warnings was discretionary and subject to policy considerations, the Third Circuit specifically rejected the argument Plaintiff advances here—that once the NPS decides to warn, it loses discretion. Id. at 337 ("[W]e reject [the plaintiff's] contention that once the Government decides to warn, it is no longer protected by the discretionary function exception. The exception protects both the decision whether to warn and decisions regarding the scope and content of such warnings.") (emphasis in original). This Court finds the Third Circuit's application of the DFE in Abunabba convincing and adopts it in this case.

Plaintiff also suggests that because there is "no NPS policy" that specifically says a park official can deviate from the MUTCD or good traffic-engineering practices, park officials lack discretion when they install signs. (See Doc. No. 62 at 6–7, 11). This argument misses the mark. The question is whether the policies that do exist allow for discretion, not whether there is an

14
Case 1:18-cv-00255-MOC-WCM   Document 65   Filed 12/17/20   Page 14 of 19

additional policy that says deviation from existing policy is allowed. The 2006 Management Policies, the NPS Director's Order 52C, and NPS Park Roads Standards apply to decisions about signage on the Parkway and include language that allows for discretion in application. In short, NPS sign policy provides for discretion in placing and installing warning signs.

Secondly, the MUTCD itself also makes clear that its contents concerning signage and warnings are guidance and discretionary. (Doc. No. 59-3, MUTCD at 4, § 1A.09, 02 (while "[MUTCD] describes the application of traffic control devices," it "shall not be a legal requirement for their installation") (emphasis added). Per the MUTCD's own definitions, only "standard" headings are mandatory. (Id. at 10, § 1A.13). Plaintiff's own expert acknowledged there are few to no "standards" (or requirements) in the MUTCD requiring the installation of warning signs. (Doc. No. 59-4, Teague Dep. at 42:3–6; 71:13–16). Consistent with this interpretation, MUTCD Table 2C-4, which Plaintiff claims defines the appropriate distance between warning signs and hazards, is entitled, "Guidelines." (Doc. No. 59-3 at 108). Teague acknowledged that the distances in the table are guidance. (Doc. No. 59-4, Teague Dep. at 103:13–16). "Guidance" and "Guidelines" fundamentally preserve discretion.

Plaintiff also argues that the MUTCD's requirement that warning signs be based on either an engineering study or engineering judgement eliminates discretion. The MUTCD defines "engineering judgment" as

> [T]he evaluation of available pertinent information, and the application of appropriate principles, provisions, and practices as contained in this Manual and other sources, for the purpose of deciding upon the applicability, design, operation, or installation of a traffic control devices. Engineering judgment shall be exercised by an engineer, or by an individual working under the supervision of an engineer, through the application of procedures and criteria established by the engineer. Documentation of engineering judgment is not required.

(Doc. No. 59-3 at 9). This definition makes clear that engineering judgment, as contemplated by

the MUTCD, involves the application of different principles and factors and even other sources. (Id.). It does not dictate that those applying it "act only a certain way." See Cohen v. United States, Nos. 3:16-cv-01498, 3:16-cv-03053, 3:16-cv-00289, 2018 WL 4635961 at *9 (D.S.C. Sept. 27, 2018) (dismissing claim for negligent operation and maintenance of a dam, finding that Army engineering regulations requiring dams to be maintained "at or above" minimum state levels afforded discretion to government actors) (internal citation omitted). The MUTCD therefore allows for discretion.

Therefore, on the first step of the DFE analysis, this Court finds that the NPS and its employees exercise judgment concerning the installation of traffic and warning signs on the Parkway.

### B. DFE Step 2: Does the Challenged Conduct Involve Balancing Important Policy Interests?

The discretionary framework identified above is susceptible to policy considerations. The NPS is specifically tasked with minimizing intrusion upon the resource, promoting safety and enjoyment for park visitors, and managing these interests within budget and staffing limitations. (Doc. No. 20-1, Lee Decl. at ¶¶ 10–13, 19; Doc. No. 59-2, Clark Dep. at 31:19–32:5). These policy interests are not trivial—they are foundational to the NPS's very mission, as stated in the NPS Organic Act. 54 U.S.C. § 100101 (the purpose of the NPS is to conserve resources and provide for public enjoyment to "leave [resources] unimpaired for the enjoyment of future generations").

In this second step of the discretionary function analysis, the Court looks to the "objective," "general" nature of the challenged actions to decide whether they inherently involve protected policy judgments. Wood v. United States, 845 F.3d 123, 130 (4th Cir. 2017) (citing

Baum, 986 F.2d at 720–21). In Bowman, the Fourth Circuit affirmed dismissal of a claim for negligent motorist safety on the Parkway based on the DFE, observing that "[NPS] officials have more than safety in mind in determining the design and use of man-made objects such as guardrails and signs along the Parkway." 820 F.2d at 1395. Such decisions were "the result of a policy judgment" which depended on various factors, including "lack of financial resources, a desire to preserve the natural beauty of the vista . . ." or other unknown reasons. (Id.).

Consistent with Bowman, courts in the Fourth Circuit have routinely held that posting or failure to post warning signs is a policy judgment subject to the DFE. See Pifer v. United States, 903 F. Supp. 971, 974–75 (N.D. W. Va. 1995) (failing to erect guardrails and install signs were susceptible to policy analysis); Roop v. United States Park Serv., 882 F. Supp. 567, 569 (S.D. W. Va. 1995) (NPS's decision not to erect warning sign along creek protected by the DFE). Other circuits have reached the same conclusion. See Kiehn, 984 F.2d at 1104–05 (DFE barred a claim for failure to place adequate signage around cliffs in national park); see also Soldano v. United States, 453 F.3d 1140, 1147–48 (9th Cir. 2006) (DFE barred claim for omission of warning sign in Yosemite National Park). In Abunabba, the Third Circuit dismissed allegations that the NPS had failed to adequately warn park visitors of the risk of barracuda attacks—despite the existence of text warnings in the park's visitor information packet and on signs in picnic areas. 676 F.3d at 336–37.

Here, the NPS's discretionary placement of warning signs is susceptible to policy analysis. The evidence shows that NPS has numerous standards for the types of signs, how they are created, how they are built, how they are placed, and the way they are placed and mounted. (Doc. No. 59-2, Clark Dep. at 73:20–74:5; 74:15–76:23; Doc. No. 59-5, Bowers Dep., 17:6–10). These standards are "internal management component[s]" that are extracted from the

"overarching policy," the Management Policies, which implement the NPS mission to preserve unimpaired. (Doc. No. 59-2, Clark Dep., 31:24–32:15). This is precisely the type of policy consideration that "should not be subjected to judicial second-guessing." Wood, 845 F.3d at 131 (decisions fell under agency policies developed to implement statutory mission); accord In re Katrina Canal Breaches Litig., 696 F.3d 436, 451 (5th Cir. 2012) (if discretion is "grounded in the policy of the regulatory regime," the decision is immune under the DFE even if it may entail application of scientific principles) (citing Gaubert, 499 U.S. at 325).

Here, as in Bowman, Plaintiff's allegations implicate policy prerogatives entrusted to agency discretion. The precise placement and content of the "BUMP" sign implicates policy considerations for signage and warnings on the Parkway, including, among others, aesthetics, safety, and budget. (Doc. No. 20-1, Lee Decl. at ¶¶ 6–7, 9–13, 19, Doc. No. 59-5, Bowers Dep. at 31:11–15). Challenges to the precise placement and content of a warning sign on the Parkway are precluded by the DFE. Cf. Abunabba, 676 F.3d at 337.

Therefore, on the second step of the DFE analysis, this Court finds that the NPS's decision about the placement and installation of traffic and warning signs on the Parkway requires balancing important policy interests.

## IV.  CONCLUSION

Because the Court finds that both steps of the DFE analysis have been satisfied, the DFE applies to this case. As a result, Plaintiff's claims for negligent installation of signage and failure to warn under the FTCA are dismissed for lack of subject matter jurisdiction. For the reasons stated herein, Defendant's Motion to Dismiss pursuant to FED. R. CIV. P. 12(b)(1) is **GRANTED** and the Motion for Summary Judgment is **MOOT**. (Doc. No. 58).

**IT IS, THEREFORE, ORDERED** that:

1. Defendant's Motion to Dismiss, (Doc. No. 58), is **GRANTED**.

2. Defendant's Motion for Summary Judgment, (Doc. No. 58), is **MOOT**.

Signed: December 17, 2020

Max O. Cogburn Jr
United States District Judge